1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8  DANNY GILES,

9                              Petitioner,          Case No. C18-0629-RAJ-MAT

10        v.

11  DAN WHITE,                                       REPORT AND RECOMMENDATION

12                              Respondent.

13

14          <u>INTRODUCTION AND SUMMARY CONCLUSION</u>

15          Petitioner Danny Giles is a Washington prisoner who is currently confined at the

16  Washington Corrections Center in Shelton, Washington.  He seeks relief under 28 U.S.C. § 2254

17  from a 2014 Snohomish County Superior Court judgment and sentence.  Respondent has filed an

18  answer responding to petitioner's federal habeas claims and has submitted relevant portions of the

19  state court record.  Petitioner has filed a response to respondent's answer.  This Court, having

20  carefully reviewed petitioner's petition for writ of habeas corpus, all briefing of the parties, and

21  the state court record, concludes that the petition should be denied and this action should be

22  dismissed with prejudice.

23  / / /

REPORT AND RECOMMENDATION
PAGE - 1

## FACTUAL BACKGROUND

The Washington Court of Appeals, on direct appeal, summarized the facts relevant to petitioner's conviction as follows:

> Patti Berry, a nude dancer at a nightclub, went missing after leaving work sometime after 1:30 a.m. on July 31, 1995. Her car was found the next day, parked between two moving vans at a nearby car wash. There was a significant amount of blood inside of the car. A search of the surrounding area uncovered a blood-stained pair of jeans and a handbag, both appearing to belong to Berry. The police processed her car, removing, for purposes of forensic testing, its steering wheel, driver's seat headrest, and a piece of the front passenger seat's fabric containing a bloody handprint.
>
> Nine days after she went missing, Berry's body was found in a wooded area a few miles from the car wash. An autopsy of the body revealed that the cause of her death was blood loss from 16 to 18 stab wounds. A forensic pathologist's analysis concluded that the rate of decomposition of her body was consistent with death occurring on July 31.
>
> The police investigation identified several suspects, none of whom were Danny Giles. The police made no arrest. This remained so for many years.
>
> Periodically, over the next many years, investigators conducted in-depth deoxyribonucleic acid (DNA) testing of the evidence seized. The testing identified a partial match between the DNA of Danny Giles and the DNA samples taken from Berry's jeans and handbag and her car's steering wheel and driver's seat headrest.[1] These matches indicated that Giles could not be excluded as a suspect and, thus, were consistent with a theory that Giles had murdered Berry.
>
> The DNA profile matches led the police to investigate Giles, uncovering additional evidence that he may have been the killer: he had visited the nightclub where Berry worked on previous occasions, he had poor opinions of sex workers, he sometimes carried a knife, and he lived and worked in the area, frequenting a bar near the car wash where Berry's car was discovered and working for a landscaper near the wooded lot where Berry's body was found.
>
> During a police interview, Giles initially denied knowing Berry. However, after being confronted with the DNA profile partial matches, he said that it was possible that he and engaged in intercourse with her but could not explain why his DNA would be in Berry's car. In addition, in 2012, a witness, Todd Horton, came

---

[1] [Court of Appeals footnote] The testing excluded Giles as a contributor to both male DNA found on fingernail clippings taken during Berry's autopsy and male DNA found in the bloody handprint on the passenger seat of Berry's car.

REPORT AND RECOMMENDATION
PAGE - 2

forth to claim that in the early morning in question he had seen a man who looked like Giles washing out a car's floor mats, backseat, and trunk, and that the substance being washed out looked murky, like blood.

Giles was charged with murder in the first degree, committed while armed with a deadly weapon, arising from the death of Patti Berry.  Based on a separate investigation, Giles was also charged with murder in the first degree arising from the death of Tracey Brazzel.  Prior to trial, Giles moved to sever the murder charges for trial.  The trial court granted Giles' motion.

As part of his defense, Giles sought to present evidence that someone other than him had killed Berry.[2]  In so doing, Giles identified 11 other individuals and sought permission to present to the jury the "other suspect" evidence for each individual.  The trial court held hearings over the course of five days regarding the admissibility of this evidence.  At the first such hearing, evidence pertaining to five of the individuals identified by Giles was excluded by the trial court when Giles' counsel admitted that he did not have sufficient evidence to warrant presenting any of those individuals to the jury as the true killer.  Thereafter, the trial court permitted Giles to introduce evidence of one individual, Bryan Petitclerc, as the perpetrator and excluded evidence pertaining to the remaining five.

At trial, on the 12th day of the State's case in chief, Giles' attorneys filed a motion in limine regarding the upcoming testimony of Kristopher Kern, the State's expert witness.  The State indicated that Kern would testify that he had familiarized himself with the facts of the case and had reviewed the DNA analyses regarding Giles' DNA found inside Berry's car and on Berry's possessions.  Based on his expertise and his familiarity with the facts, the State planned to have Kern testify regarding conclusions he had drawn as to the likelihood that Giles had been inside Berry's car and touched those of her possessions found nearby.  Giles' motion requested that Kern be limited to testifying that the DNA evidence was "consistent with" the postulation that Giles touched Berry's car and belongings, not that it was "likely" that Giles did so.  The court granted the motion, stating, "I guess I'm a bit bothered by the term likely.  [Kern] could say his opinion, based on everything he reviewed, is this, but I don't think he can quantify it has likely, but you can ask him his opinion, based on what he's reviewed."

During his testimony, however, Kern, in response to the prosecutor's questions, testified that the DNA evidence established that it was "likely" that Giles was in Berry's car and that it was "likely" that Giles touched some of her belongings.  Before the jury, defense counsel objected to each statement, citing a lack of foundation but not referencing the trial court's prior ruling.  The trial court overruled each objection.

---

[2] For ease of reference, we refer to such evidence as "other suspect" evidence.

1

2

3

4

5

       Immediately after Kern's second answer, a recess was taken.  At this time, defense counsel informed the court that her objections had been based on the trial court's previous ruling.  The trial court left the bench to review its notes.  Upon returning to the bench, the trial court ruled that Kern's testimony violated its prior ruling.  Defense counsel requested that a curative instruction be given to the jury.  Defense counsel deferred to the trial court to draft the curative instruction and approved of the curative instruction composed by the court.  The trial court inquired as to whether any other matters remained for decision.  Defense counsel requested nothing further from the court.

6

7

       The jury was brought into the courtroom.  The trial court ordered the offending testimony stricken from the record.  The curative instruction was then read to the jury.

8

       After a 15-day trial, the jury found Giles guilty of Berry's murder.

9

(Dkt. 21, Ex. 8 at 1-5.)

10

PROCEDURAL BACKGROUND

11

       Petitioner was sentenced on November 5, 2014 to a total term of 572 months confinement,

12

which included a 24-month deadly weapon enhancement, and the judgment and sentence was filed

13

the same day.  (*See id.*, Ex. 3.)  Petitioner thereafter appealed his conviction to the Washington

14

Court of Appeals.  Petitioner's appellate counsel identified two assignments of error in petitioner's

15

opening brief on appeal: (1) the state's expert improperly commented on petitioner's guilt and

16

violated his right to a jury trial; and (2) the trial court violated petitioner's due process right to

17

present a defense by prohibiting other suspect evidence.  (*See id.*, Ex. 4 at 1-2.)  Petitioner also

18

filed a *pro se* statement of additional grounds in which he identified the following four issues for

19

review: (1) the prosecutor committed misconduct during closing argument; (2) the trial court

20

denied him the right to present a defense when it excluded other suspect evidence; (3) defense

21

counsel rendered ineffective assistance when counsel failed to retain a "witness identification

22

expert;" and (4) cumulative error denied him a fair trial.  (*Id.*, Ex. 5.)

23

       On November 28, 2016, the Court of Appeals issued an unpublished opinion affirming

REPORT AND RECOMMENDATION
PAGE - 4

petitioner's conviction.  (*Id*., Ex. 8.)  Petitioner thereafter filed a motion for reconsideration pertaining only to the award of appellate costs, and that motion was denied on January 10, 2017. (*Id*., Exs. 9, 12.)

Petitioner next sought discretionary review by the Washington Supreme Court.  (*Id*., Ex. 13.)  Petitioner identified the following five issues in his petition for review:  (1) the trial court denied petitioner's due process right to present a defense when it prohibited other suspect evidence; (2) the trial court erred in denying petitioner's motion for a new trial based on newly discovered evidence concerning one of the other suspects; (3) the prosecutor committed misconduct during direct examination of the state's expert witness; (4) the appellate court abused its discretion in granting the state's request for $21,744.97 in costs; and (5) the prosecutor committed misconduct during closing argument.  (*See id*.)  The Supreme Court issued an order denying review without comment on May 3, 2017, and the Court of Appeals issued a mandate terminating direct review on July 28, 2017.  (*Id*., Exs. 14, 15.)

On April 30, 2018, petitioner filed a personal restraint petition in the Washington Court of Appeals.  (*Id*., Ex. 16.)  Petitioner identified six grounds for relief in his petition: (1) police detectives tampered with physical evidence in the form of petitioner's recorded statements; (2) the prosecutor committed misconduct by allowing a state's witness to testify to facts the prosecutor knew were wrong; (3) the trial court erred in admitting a portion of petitioner's recorded statement to the police in which the police accused petitioner of lying; (4) the police tampered with evidence and violated the chain of custody; (5) the trial court erred in admitting petitioner's recorded statements to the police because petitioner was not read his *Miranda* rights; and (6) ineffective assistance of appellate counsel.  (*See id*., Ex. 17.)  On December 5, 2018 the acting chief judge of the Court of Appeals issued an order dismissing the petition.  (*Id*., Ex. 20.)

REPORT AND RECOMMENDATION
PAGE - 5

Petitioner thereafter filed a motion for discretionary review in the Washington Supreme Court. (*Id.*, Ex. 21.) Petitioner identified in his motion for discretionary review essentially the same six issues as were presented to the Court of Appeals in his personal restraint petition. (*See id.*, Ex. 21 at 2, Ex. 22.) On July 18, 2019, the commissioner of the Supreme Court denied petitioner's request for discretionary review. (*Id.*, Ex. 24.) The commissioner addressed and rejected petitioner's first five issues on the merits. (*See id.*) As to petitioners' sixth claim, that alleging ineffective assistance of appellate counsel, the commissioner did not address the merits, noting that petitioner had presented no substantive argument in support of the claim. (*Id.*, Ex. 24 at 4 n.2.) Petitioner filed a motion to modify the commissioner's ruling which was denied by the chief justice on October 3, 2019. (*Id.*, Exs. 25, 26.) The Court of Appeals issued a certificate of finality in petitioner's personal restraint proceedings on November 14, 2019. (*Id.*, Ex. 27.)

Petitioner filed his federal habeas petition challenging is 2014 Snohomish County judgment and sentence on May 1, 2018, together with a motion seeking to stay and hold in abeyance his federal habeas petition pending exhaustion in the state courts of several of his claims for federal habeas relief. (*See* Dkt. 1.) Petitioner's motion was granted and this action was ordered stayed on July 20, 2018. (Dkt. 8.) The stay was lifted on October 22, 2019 after petitioner advised the Court that his state court proceedings had concluded. (*See* Dkts. 13, 15.) Petitioner's federal habeas petition is now ripe for review.

<u>GROUNDS FOR RELIEF</u>

Petitioner identifies eight grounds for relief in his federal habeas petition which may be summarized as follows:

1.    Police detectives tampered with and altered the recording of petitioner's May 17, 2011 police interview.

2.    The prosecutor committed misconduct by allowing a state's witness, Rod

REPORT AND RECOMMENDATION

PAGE - 6

Coslett, to testify to facts concerning his temporary employment of petitioner in 1995 which the prosecutor knew were false.

3.     The trial court erred by admitting a portion of petitioner's recorded statement in which the detectives accused him of lying.

4.     The police tampered with physical evidence and failed to maintain the chain of custody.

5.     The trial court erred by admitting petitioner's May 11 and May 17, 2011 recorded statements because he was not advised of his *Miranda* rights.

6.     Appellate counsel provided ineffective assistance.

7.     The admission of opinion testimony by state expert Christopher Kern violated petitioner's right to a fair trial.

8.     The trial court erred by excluding the defense's proffered "other suspect" evidence.

(*See* Dkt. 3 at 5-10, 15-21.)

<u>DISCUSSION</u>

Respondent asserts that petitioner properly exhausted some, but not all, of his grounds for federal habeas relief.  (Dkt. 20 at 8.)  Specifically, respondent concedes that petitioner fairly presented his first, second, third, fourth, fifth, and eighth grounds for relief to the Washington Supreme Court either in his personal restraint proceedings or on direct appeal.  (*Id.*)  Respondent argues, however, that petitioner's sixth and seventh grounds for relief were not fairly presented to the state's highest court and are now procedurally barred.  (*Id.*)  Finally, respondent argues that petitioner is not entitled to relief in this federal habeas action with respect to any of his exhausted claims.  (*See id.* at 12-38, 41-50.)

<u>Exhaustion/Procedural Default</u>

The Court begins by addressing petitioner's sixth and seventh grounds for relief, the two claims respondent asserts are procedurally barred.  A state prisoner is required to exhaust all

REPORT AND RECOMMENDATION
PAGE - 7

available state court remedies before seeking a federal writ of habeas corpus.  28 U.S.C. § 2254(b)(1).  The exhaustion requirement is a matter of comity, intended to afford the state courts "an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks and citations omitted).  In order to provide the state courts with the requisite "opportunity" to consider his federal claims, a prisoner must "fairly present" his claims to each appropriate state court for review, including a state supreme court with powers of discretionary review. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995), and *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

"In order to 'fairly present' an issue to a state court, a petitioner must 'present the substance of his claim to the state courts, including a reference to a federal constitutional guarantee and a statement of facts that entitle the petitioner to relief.'" *Gulbrandson v. Ryan*, 738 F.3d 976, 992 (9th Cir. 2013) (quoting *Scott v. Schriro*, 567 F.3d 573, 582 (9th Cir. 2009)). *See also Picard*, 404 U.S. at 275-78 (1971) (proper exhaustion requires a petitioner to have "fairly presented" to the state courts the exact federal claim he raises on habeas by describing the operative facts and federal legal theory on which the claim is based).  Claims that are based on the same facts must be separately exhausted if they are supported by distinct constitutional theories. *See Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

A habeas petitioner who fails to meet a state's procedural requirements for presenting his federal claims deprives the state courts of the opportunity to address those claims in the first instance. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991).  Presenting a new claim to the state's highest court in a procedural context in which its merits will not be considered absent special circumstances does not constitute fair presentation of the claim for exhaustion purposes.

1  *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994) (citing *Castille v. Peoples*, 489 U.S. 346, 351

2  (1989)).

3      Petitioner asserts in his sixth ground for relief that he was denied the effective assistance

4  of appellate counsel. (Dkt. 3 at 17.)  Respondent argues that petitioner failed to properly exhaust

5  this claim because he failed to fairly present the claim to the Washington Supreme Court.  (Dkt.

6  20 at 35, 38-39.)  As respondent correctly notes, it appears petitioner attempted to present a claim

7  resembling his sixth ground for federal habeas relief to the Washington Supreme Court in his

8  motion for discretionary review in his personal restraint proceedings.  In the statement of issues

9  section of his motion, petitioner identified his sixth claim for relief as one asserting ineffective

10  assistance of appellate counsel. (*See* Dkt. 21, Ex. 21 at 2, Ex. 22 at 7.)  However, in the argument

11  section of his motion, petitioner did not identify the claim as one asserting ineffective assistance

12  of appellate counsel, identify the pertinent constitutional provision, cite any legal authority, or

13  present any substantive argument in support of the claim.  In fact, the sum total of the argument

14  presented to the Washington Supreme Court was as follows:

> 6.  The Court of Appeals' ruling that no relief is warranted and petitioner
15  failed to show prejudice.  Petitioner requests that this is inconsistent with state and
> federal jurisprudence and requests further review.
16

17  (*Id.*, Ex. 22 at 24.)  The Supreme Court commissioner expressly declined to review the claim

18  because petitioner "devote[d] no substantive argument to it."  (*Id.*, Ex. 24 at 4 n.2.)

19      There can be little question that petitioner failed to fairly present his ineffective assistance

20  of appellate counsel claim to the state's highest court, particularly in light of the court's express

21  refusal to consider the claim.[3]  Notably, petitioner does not appear to challenge respondent's

22

23      [3] The Washington Supreme Court has stated that even where an issue is identified in a petition for review, it
will be deemed abandoned if the issue is not supported by argument or authority in the petition.  *See State v.*

REPORT AND RECOMMENDATION
PAGE - 9

1    assertion that he failed to properly present his ineffective assistance of appellate counsel claim to

2    the Washington Supreme Court, he argues only that his failure to do so should be excused for

3    reasons that will be discussed below.  (Dkt. 24 at 1-2.)  As the parties appear to agree that petitioner

4    failed to fairly present his sixth ground for relief to the Washington Supreme Court for review, this

5    Court concludes that the claim has not been properly exhausted.

6            Petitioner asserts in his seventh ground for relief that the admission of opinion testimony

7    by state expert Christopher Kern violated a ruling in limine and violated his right to a fair trial.

8    (Dkt. 3 at 19.)   Respondent argues that petitioner also failed to fairly present this claim to the

9    Washington Supreme Court.  (Dkt. 20 at 35, 39.)  Respondent notes that while petitioner raised

10   similar factual allegations in his petition for review on direct appeal, he identified a different legal

11   theory in the Supreme Court than he did in the Court of Appeals.  (*See id.*)  The record reflects that

12   petitioner alleged in his opening brief on direct appeal essentially the same claim as is alleged here;

13   *i.e.*, that the expert witness's testimony in violation of the ruling in limine deprived him of his right

14   to a fair trial.  (*See* Dkt. 21, Ex. 4 at 35-42.)  However, in his petition for review to the Supreme

15   Court, petitioner alleged that the prosecutor committed misconduct in eliciting improper testimony

16   from the state's witness (*see id.*, Ex. 13 at 29-32), a fundamentally different legal claim than was

17   presented to the Court of Appeals.  In fact, petitioner acknowledged in his petition for review that

18   he had raised the issue as a violation of his right to a jury trial in the Court of Appeals, and that he

19   was presenting his prosecutorial misconduct claim for the first time in his petition for review.  (Dkt.

20   21, Ex. 13 at 29 n.9.)  Because the record makes clear that petitioner never presented the precise

21   claim asserted in this federal habeas action to the Washington Supreme Court, the claim has not

22

23   *Motherwell*, 114 Wn.2d 353, 358 n.3 (1990); *see also Schmidt v. Cornerstone Investments*, 115 Wn.2d 148, 160
     (1990).

REPORT AND RECOMMENDATION
PAGE - 10

1    been properly exhausted.

2        When a petitioner fails to exhaust his state court remedies and the court to which the

3    petitioner would be required to present his claims in order to satisfy the exhaustion requirement

4    would now find the claims to be procedurally barred, there is a procedural default for purposes of

5    federal habeas review. *Coleman*, 501 U.S. at 735 n.1. Respondent argues that petitioner, having

6    failed to properly exhaust his sixth and seventh grounds for relief, would now be barred from

7    presenting those claims to the state courts under RCW 10.73.090. (Dkt. 20 at 35, 40.) Respondent

8    argues that petitioner would also likely face additional obstacles to returning to the state courts to

9    exhaust his unexhausted claims. (*Id*. at 40.)

10       RCW 10.73.090(1) provides that a petition for collateral attack on a judgment and sentence

11   in a criminal case must be filed within one year after the judgment becomes final. Petitioner's

12   judgment became final for purposes of state law on July 28, 2017, the date the Court of Appeals

13   issued its mandate terminating direct review. *See* RCW 10.73.090(3)(b). It therefore appears clear

14   that petitioner would now be time barred from returning to the state courts to present his

15   unexhausted claims. *See* RCW 10.73.090. In addition, because petitioner previously pursued a

16   collateral challenge in the state courts, the state courts are not likely to entertain another such

17   challenge from petitioner. *See* RCW 10.73.140; RAP 16.4(d). This Court therefore concludes that

18   petitioner has procedurally defaulted on his sixth and seventh grounds for relief.

19       When a state prisoner defaults on his federal claims in state court, pursuant to an

20   independent and adequate state procedural rule, federal habeas review of the claims is barred

21   unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

22   alleged violation of federal law, or can demonstrate that failure to consider the claims will result

23   in a fundamental miscarriage of justice. *Id*. at 750. To satisfy the "cause" prong of the cause and

REPORT AND RECOMMENDATION
PAGE - 11

prejudice standard, a petitioner must show that some objective factor external to the defense prevented him from complying with the state's procedural rule. *Id*. at 753 (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). The Supreme Court, in *Murray*, provided examples of objective impediments which could constitute cause: (1) the factual or legal basis for a claim was not reasonably available at the time of the default; (2) interference by government officials made compliance with the procedural rule impracticable; and (3) ineffective assistance of counsel. *Murray*, 477 U.S. at 488-89.

To show "prejudice," a petitioner "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). Only in an "extraordinary case" may the habeas court grant the writ without a showing of cause or prejudice to correct a "fundamental miscarriage of justice" where a constitutional violation has resulted in the conviction of a defendant who is actually innocent. *Murray*, 477 U.S. at 495-96.

Petitioner, in his response to respondent's answer, attempts to demonstrate cause for his failure to properly exhaust his sixth and seventh grounds for relief. (*See* Dkt. 24 at 1-6.) With respect to his sixth ground for relief, petitioner asserts that he ran out of time in preparing his motion for discretionary review and that he did the best he could to present the claim and get his motion mailed to the court on time. (*Id*. at 1.) Petitioner also asserts that he thought requesting further review was all that was necessary in order to adequately present the claim to the Supreme Court. (*Id*. at 4.) State procedural rules governing the presentation of motions for discretionary review, including those concerning briefing requirements and timeliness, cannot reasonably be deemed an impediment to petitioner's proper presentation of his claims, nor can petitioner's

1    purported misunderstanding of what those rules require.

2        It is noteworthy that petitioner properly briefed the merits of five of his six grounds for

3    relief in the time allotted under the rules.  The fact that petitioner failed to reserve time to properly

4    brief his sixth ground for relief cannot be attributed to any external forces.  Petitioner is solely

5    responsible for the litigation choices he made.  The Court also notes that petitioner had the option

6    of requesting additional time to file his motion for discretionary, *see* RAP 18.8, but did not do so.

7    While petitioner claims he did not have time to request an extension, the Court is not persuaded

8    that petitioner could not have, through the exercise of reasonable diligence, accomplished this

9    relatively simple task and obtained more time to fully present his claims had he desired to do so.[4]

10   Petitioner has not demonstrated cause for his failure to exhaust his sixth ground for relief.

11       With respect to his seventh ground for relief, petitioner indicates he was unaware his

12   federal habeas claim is different from the claim asserted in his petition for review, a document

13   which was ostensibly filed *pro se* but which petitioner suggests was actually prepared by his

14   appellate counsel.[5]  (*See id.* at 5.)  Petitioner also indicates that he wishes to add his prosecutorial

15   misconduct argument to his federal habeas petition, and he argues that if his seventh ground for

16   relief is deemed unexhausted this is "newly discovered information."  (*Id.*)  Petitioner's

17   misunderstanding about which claims were presented in which forum does not constitute an

18   external impediment which might conceivably excuse petitioner's failure to exhaust.  Moreover,

19   petitioner's attempt to incorporate his prosecutorial misconduct claim into his federal habeas

20

21       [4] Petitioner also suggests that prison lockdowns that occurred *after* he mailed his motion for discretionary
22   review to the Supreme Court constitute an external impediment as they affected his ability to mail documents out of
     the facility and to access the law library.  (Dkt. 24 at 3.)  The Court fails to comprehend how events which transpired
     after petitioner mailed his motion could have affected his ability to timely file the motion.

23       [5] The document does, in fact, appear as though it was prepared by counsel even though it was signed and
     filed by petitioner.  (Dkt. 21, Ex. 13.)

REPORT AND RECOMMENDATION
PAGE - 13

1    petition will not salvage the claim. As noted above, petitioner raised his prosecutorial misconduct

2    claim for the first time in his petition for review. Raising a claim for the first time in the state's

3    highest court on discretionary review does not constitute fair presentation for exhaustion purposes.

4    *See Casey v. Moore*, 386 F.3d 896, 918 (9th Cir. 2004).

5        For the reasons set forth above, this Court concludes that petitioner has not established

6    cause for his procedural default. Even assuming petitioner's arguments were sufficient to establish

7    cause, he makes no effort to demonstrate prejudice in relation to the alleged constitutional errors.

8    Likewise, petitioner makes no colorable showing of actual innocence. Accordingly, this Court

9    recommends that petitioner's federal habeas petition be denied with respect to his sixth and seventh

10    grounds for relief.

11    <u>Standard of Review for Exhausted Claims</u>

12        Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus

13    petition may be granted with respect to any claim adjudicated on the merits in state court only if

14    (1) the state court's decision was contrary to, or involved an unreasonable application of, clearly

15    established federal law, as determined by the Supreme Court, or (2) the decision was based on an

16    unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

17    In considering claims pursuant to § 2254(d), the Court is limited to the record before the state court

18    that adjudicated the claim on the merits, and the petitioner carries the burden of proof. *Cullen v.*

19    *Pinholster*, 563 U.S. 170, 181-82 (2011).

20        Under § 2254(d)(1)'s "contrary to" clause, a federal court may grant the habeas petition

21    only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a

22    question of law, or if the state court decides a case differently than the Supreme Court has on a set

23    of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under

the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *See id*. at 407-09.

The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). The Supreme Court has further explained that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 88 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Clearly established federal law, for purposes of AEDPA, means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer*, 538 F.3d at 71-72. This includes the Supreme Court's holdings, not its dicta. *Id.* "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

Under § 2254(d)(2), a petitioner may only obtain relief by showing that the state court's conclusion was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." "To show such an error occurred, the petitioner must establish that the state court's decision rested on a finding of fact that is '*objectively* unreasonable.'" *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (quoting *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004)) (emphasis in original); *see also Lockyer*, 538 U.S. at 75. "Factual findings are objectively unreasonable if they are unsupported by sufficient evidence

1  in the state court record." *Tong Xiong v. Felker*, 681 F.3d 1067, 1074 (9th Cir. 2012).  In addition,

2  the Court presumes the state court's factual findings to be sound unless the petitioner rebuts "the

3  presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

<u>Ground One:  Tampering with Evidence</u>

4

5          Petitioner asserts in his first ground for relief that police detectives tampered with evidence

6  in the form of an audio recording of an interview they conducted with petitioner on May 17, 2011

7  at the Stafford Creek Corrections Center ("SCCC").  (Dkt. 3 at 5.  *See also* Dkt. 21, Ex. 17 at 16-

8  26.)  Petitioner suggests that the recording was altered because it does not reflect that he requested

9  an attorney during the interview.  (*See id.*)  Petitioner points to the fact that the police failed to

10  book the microcassette tapes containing the recordings of his interviews into evidence as support

11  for his claim that they tampered with evidence.  (Dkt. 3 at 5.)  Underlying petitioner's evidence

12  tampering claim is his belief that if his request for counsel had been properly memorialized on the

13  audio recording, the statement he gave to police on May 17, 2011 would have been ruled

14  inadmissible.  (*See* Dkt. 24 at 31-34.)  The record does not support any part of this claim.

15          The trial court conducted a pretrial hearing pursuant to Washington Superior Court

16  Criminal Rule (CrR) 3.5 to determine the admissibility at trial of various statements petitioner

17  made to police detectives during their investigation of the murders of Patti Berry and Tracey

18  Brazzel.  Among the statements at issue were those made to Snohomish County Sheriff's Office

19  detectives during interviews conducted on May 11 and 17, 2011 at SCCC where petitioner was

20  then confined on an unrelated charge.  Those statements were recorded by the detectives and

21  transcripts of the interviews were later prepared.

22          At the CrR 3.5 hearing, the two detectives testified as did petitioner.  The detectives

23  testified that petitioner never asked for counsel during the interviews while petitioner testified that

REPORT AND RECOMMENDATION
PAGE - 16

he did make such a request, though he conceded the request did not appear in the transcript of the interview. (Dkt. 21, Ex. 28 at 34, 41, 171-72-70 and Ex. 29 at 64.)  In fact, the transcript of the May 17 interview reveals that petitioner told detectives he understood he was entitled to an attorney but was taking it upon himself to talk to them. (*See id*., Ex. 19 at 183.)  In response to that comment, detectives asked petitioner if he wanted an attorney and advised him he could have an attorney if he wanted one and they could call one for him. (*Id*., Ex. 19 at 183-84.)  Petitioner declined, explaining that he was talking about having an attorney if the matter the detectives were investigating was to go to trial. (*Id*., Ex. 19 at 184.)

The trial court concluded, based on the evidence presented at the CrR 3.5 hearing, that petitioner's claim that he had asked for a lawyer during the interviews at SCCC was not credible. The court explained that "[b]ased on the testimony of the detectives, the transcripts of the interviews, and specific acknowledgements defendant made regarding his right to be represented by an attorney during the interviews, the Court specifically finds defendant never made a request for a lawyer." (*Id*., Ex. 2 at 9. *See also* Ex. 30 at 3-4.)

The Washington Court of Appeals rejected petitioner's evidence tampering claim in his personal restraint proceedings, deferring to the trial court's findings at the CrR 3.5 hearing that petitioner never requested counsel and citing the explanation of one of the interviewing detectives that a digital recorder, not a microcassette recorder, was used to record petitioner's interviews. (*Id*., Ex. 20 at 6-7.)  The detective explained in an affidavit attached to the state's response to petitioner's personal restraint petition that the digital recorder does not have a separate tape that can be removed and booked into evidence, and that he instead downloaded the interviews onto a computer and copied them onto CDs which were then booked into evidence. (*Id*.)

In his motion for discretionary review to the Washington Supreme Court, petitioner

REPORT AND RECOMMENDATION

PAGE - 17

acknowledged his lack of awareness that the recording of his statements had been done on a digital recording device, but reiterated his contention that the recording had been altered. (*Id.*, Ex. 22 at 9-12.) The Supreme Court rejected the claim as well, again deferring to the trial court's factual findings and also observing that petitioner had not shown it would have made any difference to the outcome if he had asked for counsel because the trial court found that petitioner's police interviews were not custodial and that the Fifth Amendment right to counsel therefore did not attach. (*See id.*, Ex. 24 at 1-2.)

The trial court's factual finding that petitioner never made a request for a lawyer is presumed correct, 28 U.S.C. § 2254(e)(1), and petitioner offers nothing here to rebut that presumption. The appellate courts reasonably relied on the trial court's findings, and on the affidavits provided by detectives in petitioner's personal restraint proceedings describing the manner in which petitioner's statements were recorded and preserved, to reject petitioner's claim that the police tampered with the recordings. Petitioner offers nothing in this proceeding, aside from mere conjecture, to support his claim that the police acted improperly in relation to the recordings. Moreover, as will be discussed further below, because petitioner's interviews with police were determined to be non-custodial, even if petitioner were able to establish that the tapes were altered and that he actually did request counsel, he would not be entitled to any relief because he was not, in fact, entitled to counsel during those interviews. Petitioner's federal habeas petition should therefore be denied with respect to his first ground for relief.

<u>Ground Two:  Presentation of False Evidence</u>

Petitioner asserts in his second ground for relief that the prosecutor committed misconduct by allowing a state's witness to testify to facts the prosecutor knew were wrong. (Dkt. 3 at 7.) At issue in this claim is the testimony of Rodney Coslett, the owner of a landscape company that had

a contract to landscape the apartment complex near where Patti Berry's body was found in 1995. (*See id.*; Dkt. 24 at 34-37.) Coslett testified that he hired petitioner to work for him in the spring of 1995. (*Id.*) Petitioner claims that a document from the Washington Employment Security Department shows he worked for Coslett in the fall of 1993, and he suggests that this document demonstrates Coslett's testimony that petitioner worked for him in 1995 was false.

It is well established that a conviction obtained by the knowing use of false evidence is fundamentally unfair, and that such a conviction may not stand under the Fourteenth Amendment if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Napue v. Illinois*, 360 U.S. 264, 269-71 (1950). *See also*, *United States v. Agurs*, 427 U.S. 97, 103 (1976). The knowing use of false evidence violates due process regardless of whether the prosecutor solicits the false evidence or merely allows it to go uncorrected when it appears. *Napue*, 360 U.S. at 269. The presentation of inconsistent or contradictory testimony is not sufficient to establish that a prosecutor knowingly presented false testimony. *See United States v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir. 1992), *United States v. Necoechea,* 986 F.2d 1273, 1280 (9th Cir. 1993).

In order to succeed on a claim that the prosecutor used false evidence to convict him, a petitioner "must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003) (citing *Napue*, 360 U.S. at 269-71). The test for materiality under *Napue* is whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103.

The state courts rejected petitioner's claim that the prosecutor knowingly elicited perjured

testimony in petitioner's personal restraint proceedings. In its ruling denying discretionary review, the Washington Supreme Court first noted that Coslett's testimony that petitioner worked for him in 1995, the year the homicide was committed, was significant because the victim's body was found in a wooded lot next to an apartment complex serviced by the landscape company. (Dkt. 21, Ex. 24 at 3.) The Court then went on to explain its conclusion as follows:

> [T]he fact that Mr. Giles worked for the company in 1993 does not make false the owner's testimony that he employed Mr. Giles temporarily the summer of 1995. The owner explained that he usually paid temporary workers "off the books," and that he particularly recalled employing Mr. Giles the summer of 1995 (19 years before the owner's testimony) because it was around the time of his divorce. In any event, . . . the significance of this testimony was in demonstrating Mr. Giles's familiarity with the area where the victim's body was found, which he could have gained when he worked for the landscape company in 1993 (the owner said his company had been servicing the apartment complex since 1993). Thus, Mr. Giles demonstrates no prejudice on this point.

(*Id.*, Ex. 24 at 3-4.)

Petitioner fails to demonstrate that the state courts' decision with respect to his claim that the prosecutor knowingly solicited false evidence was contrary to, or constituted an unreasonable application of, clearly established federal law. Nothing in the record establishes that the challenged testimony was actually false or that the alleged false testimony was material. Accordingly, petitioner's federal habeas petition should be denied with respect to his second ground for relief.

## Ground Three: Admission of Police Accusation of Lying

Petitioner asserts in his third ground for relief that the trial court erred in admitting a portion of a recorded statement where police accused him of lying. (Dkt. 3 at 8.) Petitioner contends that admission of the accusation impermissibly invaded the province of the jury and denied him his right to a fair trial. (*Id.*)

Petitioner does not identify in his petition the precise statement at issue. However, a review

REPORT AND RECOMMENDATION
PAGE - 20

1  of petitioner's personal restraint petition and of his response to respondent's answer in this

2  proceeding makes clear that petitioner is referencing a statement made by detectives who

3  interviewed him at SCCC on May 17, 2011. (*See* Dkt. 21, Ex. 17 at 44; Dkt. 24 at 39-40.)  The

4  original transcript of the May 17, 2011 interview is 192 pages long. (*See* Dkt. 19, Ex. 5.)  On page

5  84 of that transcript the following exchange occurred between Snohomish County Sheriff's Office

6  Detective Scharf and petitioner:

7  Det. Scharf:    Well, what we have to add to it is that this is your chance to show
                   everybody what's good inside you.  Show us the good side of

8                 Danny Giles and help us at least know what happened to Tracey.
                   We need, we need to get that one mystery solved because her

9                 family needs to have the answers and be able to, to bury her remains
                   if they're available.  That's what we need.  So, what did you did

10                [sic] with them?

11 Danny Giles:   Thhh What did I already tell you?

12 Det. Scharf:   You told us a lie.  I'm trying to…

13 Danny Giles:   (unintelligible) know that.

14 Det. Scharf:   I'm trying, I'm trying to reason with you to get you to tell the truth.

15 Danny Giles:   No, you're building your case right now, is all you're doing

16 (Dkt. 21, Ex. 17 at 48 and Ex. 19 at 150.)

17         The state appellate courts rejected petitioner's claim that the trial court erroneously

18 admitted this portion of the May 17, 2011 interview because the remark at issue had been redacted

19 from the portion of the interview provided to the jury.  (*Id*., Ex. 20 at 7 and Ex. 24 at 3.)  The

20 record before this Court appears to confirm that the challenged passage was not presented to the

21 jury.  Prior to trial, the prosecutor and defense counsel worked together to determine which

22 portions of the May 17 statement would be admitted at trial.  (*Id*., Ex. 19 at 369-370.)  A particular

23 focus of the redactions were discussions related to the Tracey Brazzel murder case (*see id*., Ex. 19

REPORT AND RECOMMENDATION
PAGE - 21

at 370), which included the passage set forth above.  The redacted version of the May 17 statement was only 46 pages in length and did not include the challenged passage.  (*See id.*, Ex. 19 at 308-53.)  The record reflects that jurors were provided a transcript of the redacted recording and the redacted recording was played for the jurors at trial.  (*See id.*, Ex. 44 at 6-7.)  Petitioner points to no evidence in the record demonstrating that the challenged passage was admitted at trial.  Petitioner's federal habeas petition should therefore be denied with respect to his third ground for relief.

<u>Ground Four:  Tampering with Evidence/Violating Chain of Custody</u>

Petitioner asserts in his fourth ground for relief that the police tampered with evidence and violated the chain of custody.  (Dkt. 3 at 10.)  Petitioner offered the following facts in support of his fourth ground for relief:

> The wife of police detective John Padilla found several items of evidence associated with a murder investigation in the closet of their residence.  These evidence items were sent to a private lab in North Carolina, they were sent back, were not re-booked into evidence room, and had been missing for three (3) years and 9 months from evidence.  Padilla was later fired for breaking all policies and procedures associated with the proper handling, booking and chain of custody of these evidence items.

(*Id.*)  Petitioner does not identify any federal constitutional basis for this claim in his federal habeas petition, though he argued in the state courts that the mishandling of the physical evidence violated his due process rights.  (*See* Dkt. 21, Ex. 17 at 49-60.)  Petitioner made a similar argument in his response to respondent's answer in this action.  (*See* Dkt. 24 at 41-44.)

It is well established that "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764 (1990).  Questions related to the admissibility of evidence are typically matters of state law for which federal habeas relief is unavailable.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Only if the admission of evidence rendered the trial fundamentally

1   unfair in violation of due process is federal habeas relief available.  *Johnson v. Sublett*, 63 F.3d

2   926, 930 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 67-69).

3          When considering whether evidence alleged to have been erroneously admitted at trial

4   rendered the proceeding fundamentally unfair, the federal habeas court must determine whether

5   the error "had substantial and injurious effect or influence in determining the jury's verdict."

6   *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).  In *Holley v. Yarborough*, 568 F.3d 1091, 1101

7   (9th Cir. 2009), the Ninth Circuit observed that "even clearly erroneous admissions of evidence

8   that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if

9   not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court."  The Ninth

10  Circuit went on to explain that while the Supreme Court "has been clear that a writ should be

11  issued when constitutional errors have rendered the trial fundamentally unfair," the Court "has

12  made very few rulings regarding the admission of evidence as a violation of due process."  (*Id.*

13  (citation omitted).)

14         The Washington appellate courts rejected petitioner's claim regarding the mishandling of

15  evidence in his personal restraint proceedings.  (*See* Dkt. 21, Ex. 20 at 9-10 and Ex. 24 at 4.)  The

16  Washington Supreme Court explained its conclusion as follows:

17         Mr. Giles . . . argues that the detective first assigned to the investigation in 1995
18         mishandled hairs found on the victim's body and a sample of blood drawn during
           her autopsy.  The detective sent these items to a lab in 1999, and in 2004, the sealed
19         package containing these items (which the lab had returned to the detective) was
           found in the former home of the detective's estranged wife.  It was also discovered
20         that some videotapes had not been booked into evidence consistent with evidence
           handling protocol, and that one videotape was missing.  This matter ultimately
21         resulted in the detective's termination.  But again, Mr. Giles demonstrates no
           prejudice.  He stipulated that the hair and the blood belonged to the victim, and thus
22         those items had no inculpatory value specifically against him, and the misplaced
           videotape showed only the area where police recovered the victim's clothing, which
23         also did not incriminate Mr. Giles.  Further, the detective's misconduct was
           revealed at trial, and thus the jurors were able to judge the credibility of the evidence
           themselves.

REPORT AND RECOMMENDATION
PAGE - 23

(*Id.*, Ex. 24 at 4.)

Whether or not the mishandled evidence was properly admitted implicates only state law concerns.  It is noteworthy that at no point did the defense challenge the admissibility of the evidence and, in fact, it appears clear from the record that the parties agreed the evidence was admissible. (*See id.*, Ex. 33 at 19-21.)  In fact, the defense actually used the fact of the mishandled evidence to its advantage during closing argument as it raised questions regarding the quality of the police investigation and thereby cast doubt on the state's case.  (*See id.*, Ex. 48 at 96.)

Even assuming the claim could be construed as one implicating petitioner's federal constitutional rights, petitioner cites to no clearly established federal law which would have required the trial court to limit the introduction of the evidence at issue here and, as the state appellate courts correctly noted, nothing in the record suggests that petitioner could have conceivably been prejudiced by the admission of the evidence.  Petitioner fails to demonstrate that the decision of the state courts rejecting his challenge to the alleged mishandling of evidence and violation of the chain of custody was either contrary to, or constituted an unreasonable application of, clearly established federal law and, thus, petitioner's federal habeas petition should be denied with respect to his fourth ground for relief.

Ground Five:  Failure to Give <i>Miranda</i> Warnings

Petitioner asserts in his fifth ground for relief that the trial court erred in admitting recorded statements from his May 11, 2011 and May 17, 2011 interviews with detectives at SCCC because he was in custody at the time of the interviews and was therefore entitled to *Miranda* warnings prior to the interviews, which the detectives did not provide.  (*See* Dkt. 3 at 15; Dkt. 24 at 44-50.) Petitioner sets forth the following facts in support of his *Miranda* claim:

> On May 11, 2011 police detectives went to Stafford Creek Correction[s] Center to interview petitioner regarding the murder of Patti Berry.  This interview

ended with a fire alarm going off. Detectives wanted to continue the interview but petitioner stated he had nothing else to add in their attempts to solve this case. Then on May 17, 2011 detectives returned and it quickly turned into a situation where petitioner felt pressured to answer questions, felt as if petitioner could not just get up and leave. I told officers I was done talking to them, requested an attorney, they ignored my request and continued to ask questions. Officer's [sic] eventually made threats of the death penalty. Petitioner again stated he was done talking, and could not leave without an escort, freedom of movement was curtailed to a degree associated with arrest. This interview was in a[n] area not accessible to other prisoners, an administration building. Petitioner had an objectively reasonable belief he was not free to leave.

(Dkt. 3 at 15.) The trial court concluded, following the CrR 3.5 hearing discussed above, that the interviews were non-custodial and that petitioner's statements were admissible. (Dkt. 21, Ex. 2 at 9-11.)

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege applies in the context of custodial interrogations, *Miranda v. Arizona*, 384 U.S. 436, 467 (1966), and is binding on the states, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). In *Miranda*, the Supreme Court identified certain procedural safeguards which must precede an in-custody interrogation. *Miranda*, 384 U.S. at 478-79. In particular, a person who has been taken into custody, or deprived of his freedom in any significant way, must be informed that he has the right to remain silent and that he has the right to have an attorney present during questioning. *Id*.

The Supreme Court has explained that in the *Miranda* context, the word "custody" is a "term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). In determining whether a person is "in custody" for purposes of *Miranda*, "the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id*. at 509 (internal quotation marks and citations

REPORT AND RECOMMENDATION
PAGE - 25

1  omitted).  This "freedom-of-movement" inquiry requires a reviewing court to "examine 'all of the

2  circumstances surrounding the interrogation.'"  *Id.*  (quoting *Stansbury v. California*, 511 U.S.

3  318, 322, (1994) (per curiam)).  Relevant factors include "the location of the questioning, its

4  duration, statements made during the interview, the presence or absence of physical restraints

5  during the questioning, and the release of the interviewee at the end of the questioning." *Id.*

6  (internal citations omitted).

7      The Supreme Court has made clear, however, that "[n]ot all restraints on freedom of

8  movement amount to custody for purposes of *Miranda*." *Id.*  In *Howes*, a case which involved the

9  questioning of a state prisoner about events that occurred outside prison, the Supreme Court

10 observed that "[w]e have 'declined to accord talismanic power' to the freedom-of-movement

11 inquiry, and have instead asked the additional question whether the relevant environment presents

12 the same inherently coercive pressures as the type of station house questioning at issue in

13 *Miranda*." *Id.*  (citing *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984)).  The *Howes* Court went

14 on to explain that

15      [S]tandard conditions of confinement and associated restrictions on freedom will
       not necessarily implicate the same interests that the Court sought to protect when it
16      afforded special safeguards to persons subjected to custodial interrogation.  Thus,
       service of a term of imprisonment, without more, is not enough to constitute
17     *Miranda* custody.

18 *Id.* at 512.

19      Because the *Miranda* custody test is an objective test, "the subjective views harbored by

20 either the interrogating officers or the person being questioned" are irrelevant.  *See Stansbury*, 511

21 U.S. at 323.  "The test, in other words, involves no consideration of the 'actual mindset' of the

22 particular suspect subjected to police questioning." *J.D.B. v. North Carolina*, 564 U.S. 261, 271

23 (2011) (citation omitted).

REPORT AND RECOMMENDATION
PAGE - 26

1    The Washington appellate courts rejected petitioner's *Miranda* claim in his personal

2    restraint proceedings. The Washington Supreme Court explained its conclusion as follows:

3        Mr. Giles argues that [the interviews] were custodial and thus they should have
         been excluded from trial because he was not informed of his rights under *Miranda*
4        *v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). But Mr. Giles
         fails to show the superior court erred in finding that the interviews were not
5        custodial. Although the interviews were conducted while Mr. Giles was imprisoned
         on another matter, that fact alone does not make the interviews custodial. *State v.*
6        *Post*, 118 Wn.2d 596, 606-07, 826 P.2d 172, 837 P.2d 599 (1992). The question in
         this circumstance is whether, considering the objective circumstances, a reasonable
7        person would have felt not at liberty to terminate the interview and leave, and
         whether the interview environment presented the same inherently coercive features
8        as the type of stationhouse questioning involved in *Miranda*. *Howes v. Fields*, 565
         U.S. 499, 509, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012). Here, the detectives
9        informed Mr. Giles at the outset of each interview that he was not under arrest, did
         not have to answer their questions, and could leave any time, and each time Mr.
10       Giles expressed his understanding. In fact, in one interview, he told detectives he
         wanted to return to his cell, and they allowed him to do so. The acting chief judge
11       found no error in the superior court's determination that the interviews were not
         custodial, and Mr. Giles demonstrates no error in the acting chief judge's decision
12       meriting this court's review.

13   (Dkt. 21, Ex. 24 at 2-3.)

14       Petitioner fails to demonstrate that the state courts' adjudication of his *Miranda* claim was

15   contrary to, or constituted an unreasonable application of, clearly established federal law. The

16   state courts applied the proper standard in assessing whether petitioner was "in custody" for

17   *Miranda* purposes at the time of his interviews with detectives and reasonably concluded that he

18   was not. This conclusion is amply supported by the record of the CrR 3.5 hearing and the trial

19   court's findings regarding petitioner's credibility. Specifically, the trial court found that petitioner

20   was not credible when he claimed he did not believe he had the ability to leave the interview room

21   at SCCC during the interviews in question. (*See id.*, Ex. 2 at 8.) The trial court explained:

22       The Court bases this both on various comments the defendant made to the
         detectives during the several interviews at Stafford Creek, and the various times
23       that Detective Scharf told defendant that he was free to leave the interview room at
         any time. The defendant's claims are not consistent with the attitude he displayed

REPORT AND RECOMMENDATION
PAGE - 27

1    during the various interviews at Stafford Creek, nor with the specific statements he
2    made during the interviews.

3    (*Id*.)

4        The trial court likewise found petitioner was not credible when he claimed he was
5    intimidated by the detectives into talking to them, explaining that "[d]efendant's testimony to the
6    contrary at the 3.5 hearing is not consistent with the attitude he displayed during the various
7    interviews, nor the specific denials of being intimidated by the detectives that he made during the
8    various interviews at Stafford Creek."  (*Id*., Ex. 2 at 9.)  The trial court's factual findings are
9    entitled to deference and petitioner offers nothing in these proceedings to rebut those findings.
10   Accordingly, petitioner's federal habeas petition should be denied with respect to this fifth ground
11   for relief.

12                  Ground Eight:  Exclusion of Other Suspect Evidence

13       Petitioner asserts in his eighth ground for relief that the trial court abused its discretion and
14   violated petitioner's right to present a defense when it excluded the defense's proffered "other
15   suspect" evidence.  (*See* Dkt. 3 at 21; Dkt. 24 at 51-53.)  This claim focuses in particular on other
16   suspect evidence relating to Frank Colacurcio, Jr., Michael Beatie, and James Leslie.  (*See id*.)
17   The trial court denied the defense request to present the proffered other suspect evidence because
18   petitioner could not establish a sufficient nexus between any of these individuals and Patti Berry's
19   murder.  Petitioner maintains that he presented a sufficient evidentiary nexus to support the
20   admission of the other suspect evidence.  (Dkt. 3 at 21.)

21       "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in
22   the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution
23   guarantees defendants 'a meaningful opportunity to present a complete defense.'"  *Crane v.*

REPORT AND RECOMMENDATION
PAGE - 28

1   *Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984))

2   (internal citations omitted).  However, the right to present a defense "is not unlimited, but rather

3   is subject to reasonable restrictions," such as evidentiary and procedural rules.  *United States v.*

4   *Scheffer*, 523 U.S. 303, 308 (1998).

5          The Supreme Court has explained that "state and federal rulemakers have broad latitude

6   under the Constitution to establish rules excluding evidence from criminal trials."  *Id.*   The

7   Supreme Court has also noted its approval of "well-established rules of evidence [that] permit trial

8   judges to exclude evidence if its probative value is outweighed by certain other factors such as

9   unfair prejudice, confusion of the issues, or potential to mislead the jury."  *Holmes v. South*

10  *Carolina*, 547 U.S. 319, 326 (2006).  The right to present a meaningful defense is implicated when

11  exclusionary rules "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or

12  'disproportionate to the purposes they are designed to serve.'"  *Id.* at 324 (citing *Scheffer*, 523 U.S.

13  at 308).  In *Holmes*, the Supreme Court specifically noted its approval of state rules limiting other

14  suspect evidence when the evidence fails to sufficiently connect the other person to the crime, such

15  as where the evidence is speculative or remote, or does not tend to prove or disprove a material

16  fact.  *Id.* at 327.

17         Petitioner presented his claim regarding the exclusion of other suspect evidence to the

18  Washington Court of Appeals on direct appeal of his conviction.  The Court of Appeals rejected

19  the claim, concluding that the trial court did not err in excluding the proffered other suspect

20  evidence with respect to any of the three individuals identified by petitioner.  (*See* Dkt. 21, Ex. 8

21  at 5-19.)  The Court of Appeals discussed at length the history of Washington's "other suspect"

22  evidence rule and its current formulation, which it appears was significantly influenced by the

23  United States Supreme Court's decision in *Holmes*.  (*See id.*, Ex. 8 at 5-10.)  The Court then

REPORT AND RECOMMENDATION
PAGE - 29

identified the appropriate test under Washington law for evaluating the admissibility of other suspect evidence:

> [T]he threshold analysis for "other suspect" evidence involves a straightforward, but focused, relevance inquiry, reviewing the evidence's materiality and probative value for "whether the evidence has a logical connection to the crime."  Franklin, 180 Wn.2d at 381-82 (citing Holmes, 547 U.S. at 330).

(*Id.*, Ex. 8 at 10.)

After discussing the applicable standards for evaluating a trial court's discretionary decisions regarding the admission of evidence, the Court of Appeals went on to summarize the proffered "other suspect" evidence and to discuss the trial court's rulings with respect to each of the three "other suspects."  This Court will similarly set forth the relevant facts and state court rulings with respect to each individual separately before analyzing the state courts' conclusions as a whole.

### 1.    *Frank Colacurcio, Jr.*

The Washington Court of Appeals summarized the proffered "other suspect" evidence with respect to Frank Colacurcio, Jr., as follows:

> (1) Colacurcio was a co-owner of the nightclub at which Berry worked, (2) Berry once said that Colacurcio was a "mafia type," (3) Berry owed Colacurcio several thousand dollars for a loan that financed her breast augmentation surgery and for unpaid rental fees (amounts charged to women for the right to dance at his clubs), (4) Berry was a sex worker who had been blackmailing her customers, including one of Colacurcio's "associates," (5) Berry's mother claimed that Berry had once slapped Colacurcio after he touched her rear end, (6) Colacurcio had sent Berry to work at a strip club in Texas earlier that month and, while in Texas, Berry stated that she was afraid of going back to Washington, (7) a black car of the same color and model as a car owned by Colacurcio was seen driving away from the nightclub around the same time that Berry was last seen and in the same direction as Berry had been seen driving, (8) the nightclub's surveillance tapes requested by the police were not turned over to the police in a timely fashion, and (9) the nightclub's surveillance tape recorded on the night that Berry disappeared—unlike the videotapes for different nights—was blank.

REPORT AND RECOMMENDATION
PAGE - 30

. . . .

Giles later filed a supplemental motion offering proof that Colacurcio had been present at the nightclub on the night in question.

(Dkt. 21, Ex. 8 at 12-13.  *See also* Ex. 32 at 117-22.)

After considering the proffered evidence and the arguments of counsel, the trial court concluded that Colacurcio would not be named as an "other suspect" because the defense had not established a sufficient nexus.  (*See id*., Ex. 32 at 128-30, 132-34.)  The court noted in particular that there was no evidence that Berry was afraid of Colacurcio or that she was blackmailing him.  (*Id*., Ex. 32 at 128-30.)  The court also agreed with the prosecutor's suggestion that if Berry owed Colacurcio money, that fact actually undermined the defense theory that Colacurcio had a motive to kill her.  (*See id*., Ex. 32 at 125, 129.)

The Court of Appeals, in reviewing petitioner's challenge to the exclusion of "other suspect" evidence concerning Colacurcio, found the trial court's analysis "tenable" and explained its conclusion as follows:

> While the evidence tied Colacurcio to Berry, it did not tie him to her killing.  Thus, the trial court properly ruled that the proposed testimony seeking to identify Colacurcio as the true killer was not of a type that would cause to exist a reasonable doubt as to Giles' guilt.  Hence, the trial court did not abuse its discretion by denying Giles' request to identify Colacurcio to the jury as Berry's true killer.

(*Id*., Ex.  8 at 14 (footnote omitted).)

### 2.    *Michael Beatie*

The Washington Court of Appeals summarized the proffered "other suspect" evidence with respect to Michael Beatie as follows:

> (1) [Deputy Sheriff] Beatie worked and lived in the area, (2) Beatie was under investigation for "abuse of power and taking advantage of women" and the letter terminating his employment with the Sheriff's Office indicated that he had maintained a pattern of abusing his power for his social and sexual needs, (3) Beatie

REPORT AND RECOMMENDATION
PAGE - 31

was not on duty the night of Berry's disappearance, (4) Beatie was the first officer on the scene when Berry's car was found, (5) two officers noted in their reports that Beatie made suspicious comments about the murder investigation, (6) the day after Berry's vehicle was found, Beatie told Berry's sister that, while looking for Berry's body, he had received scratches from falling down an embankment into some blackberry bushes, (7) when Berry's body was found, Beatie went to the body recovery site, (8) Berry's body was found in blackberry bushes, and (9) Beatie called Berry's mother to offer condolences.

(*Id.*, Ex. 8 at 15-16. *See also* Ex. 29 at 130-33.)

At the initial hearing at which the "other suspect" evidence was addressed, the trial court concluded that the defense had not established a sufficient nexus for Beatie to be named as an "other suspect." (*Id.*, Ex. 29 at 132.) The trial court indicated, however, that the defense could seek reconsideration of the ruling if the defense could produce evidence that Beatie had no official responsibility as a law enforcement officer to search for Berry's missing body as such evidence would establish a sufficient nexus for Beatie to be named as an "other suspect." (*Id.*, Ex. 29 at 132-34.)

Subsequently, the defense made the following additional offer of proof pointing to Beatie as the actual killer:

(1) Beatie's knowledge and experience as a sheriff's deputy would enable him to commit and cover-up a murder, (2) at the car recovery site, Beatie placed one foot on the fender of the [sic] Berry's car, pressed his foot down on the fender to gauge the response of the car's suspension, and remarked that Berry was not in the trunk, (3) no embankment existed at the site where Beatie claimed he had fallen while searching for Berry's body, (4) a police report indicated that another officer, not Beatie, was searching for Berry's body in blackberry bushes, (5) Beatie commented that Berry's body would be found in the woods, and Berry's body was later found in a wooded lot, (6) Berry's sister and mother both said that Beatie told them that he knew Berry, (7) Berry may have been blackmailing Beatie because Beatie was purportedly the type of person who would be susceptible to blackmail attempts, and (8) Beatie was viewed as a viable suspect long into the State's investigation because, in 2007, the State compared Beatie's DNA with the steering wheel DNA sample.

REPORT AND RECOMMENDATION
PAGE - 32

(*Id*., Ex. 8 at 16.  *See also* Ex. 32 at 22-30.)

During the hearing at which the additional offer of proof was made, the trial court twice ruled that Beatie would not be named as an "other suspect."  (*Id*., Ex. 32 at 21, 38.)  The trial court noted there was a report indicating that Beatie was responsible for searching for the body and that there were blackberry bushes in the area.  (*Id*., Ex. 32 at 21.)  The trial court also concluded that the defense's claim that Berry was blackmailing Beatie was pure speculation as there were no facts to support it.  (*Id*., Ex. 32 at 38.)  The trial court went on to state "a lot of the information that's being presented here is not supported, and it doesn't establish the train of facts and circumstances." (*Id*.)

The Court of Appeals rejected petitioner's challenge to the exclusion of "other suspect" evidence pertaining to Beatie, explaining its conclusion as follows:

> As recognized by the trial court, the evidence sought to be introduced concerning Beatie lacked relevance.  Although the circumstantial evidence proffered might have tended to create a certain suspicion that Beatie may have been the true killer, other facts in the record undercut this connection.  See State v. Wade, 186 Wn. App. 749, 767-68, 346 P.3d 838, review denied, 184 Wn.2d 1004 (2015) (video surveillance recording undercut "other suspect" evidence's relevance).  As noted by the trial court, because Beatie was a sheriff's deputy who was responsible for investigating the murder, the proffered evidence showing his interest in the criminal investigation failed to logically connect Beatie to the crime in a nefarious way.  Similarly, because the remaining proffered evidence seeking to identify Beatie as the true killer required the pyramiding of speculation upon inferences in order to connect him to Berry's murder, the evidence lack probative value, failing to have a tendency to establish that he murdered Berry.  The evidence thus did not have a tendency to support a reasonable doubt as to whether Giles committed the crime.  Accordingly, the trial court did not abuse its discretion by excluding the evidence.

(*Id*., Ex. 8 at 17-18.)

### 3.     James Leslie

The Washington Court of Appeals summarized the proffered "other suspect" evidence with

respect to James Leslie as follows:

> (1) Leslie lived near the nightclub and was at the nightclub the night that Berry disappeared, (2) Leslie sat with a known drug dealer during Berry's last shift, (3) Berry danced for Leslie several times that night, (4) an individual who looked like Leslie was seen carrying a duffel bag near the car recovery site before Berry's car was recovered, (5) Leslie provided conflicting statements to the police after the murder, and (6) Leslie burned his diary when the police asked him to turn it over to them.

(*Id*., Ex. 8 at 18-19.)

The trial court denied the defense request to admit "other suspect" evidence pertaining to James Leslie, explaining that "there's nothing there that's admissible that lays a sufficient nexus." (*Id*., Ex. 29 at 138.)

The Court of Appeals agreed with the conclusion of the trial court:

> As the trial court indicated, the evidence relating Leslie to Berry is merely that Leslie was a patron of the nightclub. The remaining evidence lacks probative value because, without more, it fails to have a tendency to establish that Leslie murdered Berry. Thus, it was not evidence of a type that would give rise to a reason to doubt Giles' guilt of the charged crime. The trial court did not abuse its discretion by excluding the evidence seeking to blame Leslie for the murder.

(*Id*., Ex. 8 at 19.)

The record demonstrates that the trial court applied the proper test, as established by Washington case law, in analyzing the admissibility of petitioner's "other suspect" evidence. And, as the Washington Court of Appeals made clear in its analysis of petitioner's claim challenging the exclusion of the proffered evidence, Washington's "other suspect" evidence rule is consistent with that approved by the United States Supreme Court in *Holmes*. The appellate court thus relied on the appropriate standard in adjudicating petitioner's claim and reasonably concluded that the trial court did not abuse its discretion in excluding petitioner's evidence. Moreover, because the record makes clear that the evidence petitioner sought to admit was deemed inadmissible based

REPORT AND RECOMMENDATION

PAGE - 34

upon a well-established rule of evidence, petitioner suffered no violation of his right to present a defense.  Accordingly, petitioner's federal habeas petition should be denied with respect to his eighth ground for relief.

Certificate of Appealability

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge.  A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Under this standard, this Court concludes that petitioner is not entitled to a certificate of appealability with respect to any of the claims asserted in his amended petition.

CONCLUSION

Based on the foregoing, this Court recommends that petitioner's petition for writ of habeas corpus be denied and that this action be dismissed with prejudice.  This Court also recommends that a certificate of appealability be denied with respect to all claims asserted in this federal habeas action.  A proposed order accompanies this Report and Recommendation.

OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions

REPORT AND RECOMMENDATION
PAGE - 35

calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14) days** after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **July 6, 2020**.

DATED this 10th day of June, 2020.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 36